**NOVO NORDISK OF NORTH AMERICA, INC., Novo Nordisk Pharmaceuticals, Inc., and Novo Nordisk, A/S, Plaintiffs–Appellants,**

v.

**GENENTECH, INC., Defendant–Appellee.**

No. 95–1424.

United States Court of Appeals,
Federal Circuit.

Feb. 26, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined
April 16, 1996.

Albert L. Jacobs, Jr., Graham & James, New York City, argued, for plaintiffs-appellants. With him on the brief were Mark H. Sparrow, Jesse D. Reingold, Kelly L. Morron, Gerard F. Diebner and Daniel A. Ladow.

Nicholas L. Coch, Rogers & Wells, New York City, argued, for defendant-appellee. With him on the brief were John E. Kidd, Leora Ben–Ami and Philip E. Roux.

Before ARCHER, Chief Judge, RICH, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Novo Nordisk of North America, Inc., Novo Nordisk Pharmaceuticals, Inc., and Novo Nordisk A/S (collectively "Novo") appeal from the decision of the United States District Court for the Southern District of New York granting a preliminary injunction in favor of Genentech, Inc. *Novo Nordisk of North Am., Inc. v. Genentech, Inc.,* No. 94 Civ. 8634 (CBM) (S.D.N.Y. June 28, 1995) (preliminary injunction order). Because the court applied an erroneous claim construction in determining that Genentech established a likelihood of success on the merits of its patent infringement counterclaim, we vacate the injunction.

## BACKGROUND

Human growth hormone ("hGH") is a 191–amino acid polypeptide hormone secreted by the anterior pituitary gland. It has important metabolic effects, including stimulation of protein synthesis and cellular uptake of amino acids. The patent in suit, U.S. Patent 4,601,980 ('980 patent), assigned to Genen-

tech, is directed to a recombinant DNA method for producing a 191– or 192–amino acid human growth hormone expression product that is identical, or essentially identical, and functionally equivalent to the natural hormone.[1] The product is useful in treating hypopituitary dwarfism in children.

Prior to the '980 invention, hGH could be obtained for therapeutic use only by extracting it from the pituitary glands of human cadavers. Known recombinant DNA methods for producing hGH were deficient; they yielded not only the amino acid sequence of the protein, but also a "leader sequence" of additional amino acids at the beginning of the protein. In the natural synthesis, the leader sequence enables the protein to emerge from a pituitary cell after expression; the leader is then enzymatically removed. When hGH is recombinantly expressed in a bacterial host, however, the leader is not removed and it renders the resulting expression product biologically inactive.

The invention claimed in the '980 patent solved this problem by providing a method for *directly expressing* a human growth hormone expression product without a leader sequence. The inventors started with complementary DNA ("cDNA") encoding hGH and its leader sequence, and cleaved the cDNA encoding the leader sequence together with a portion of the codons encoding hGH to obtain a cDNA fragment containing hGH codons 24–191. Next, they synthesized a DNA fragment corresponding to the 23 missing codons plus a "start" codon, and fused that DNA fragment to the cDNA fragment. They inserted the resulting semi-synthetic gene into bacterial cells, which directly expressed a 192–amino acid product, met-hGH, consisting of the hGH molecule and one additional amino acid, methionine ("met"), coded for by the start codon.[2] Met-hGH has essentially the same bioactivity as the natural hormone, hGH. The '980 patent teaches that the extra methionine residue may be cleaved intracellularly in the bacterial host to produce a product that is identical to the natural hormone. Genentech sells met-hGH and hGH under the trademarks Protropin® and Humatrope®, respectively.

Novo does not produce human growth hormone by direct expression. Rather, it produces hGH by a "cleavable fusion expression" process that involves combining, in a plasmid: (1) a cDNA fragment containing hGH codons 24–191, (2) a genomic DNA fragment containing hGH codons 1–23, and (3) DNA encoding certain additional, cleavable amino acids.[3] Novo inserts the plasmid into a bacterial host, which expresses a fusion protein consisting of the hGH molecule and the additional amino acids. In a final step, the additional amino acids are cleaved, leaving an hGH product of 191 amino acids. Novo manufactures hGH in Denmark, and it plans to import the product for sale in the United States under the trademark Norditropin®.

Novo sued Genentech in district court, seeking a declaratory judgment that the '980 patent is invalid and not infringed by Novo. Genentech counterclaimed for infringement and moved for a preliminary injunction, arguing that Novo's importation of hGH into the United States would literally infringe claim 2 of the '980 patent (*see infra*). Genentech contended, *inter alia*, that claim 2 covers both the direct expression and cleavable fusion expression of human growth hormone. The district court accepted Genentech's claim interpretation and thus held that Genentech had established a likelihood of success on the merits of its infringement counterclaim. In addition, the court found that Genentech had shown that Novo's assertion of invalidity lacked merit. The court also found that the equities and public interest were in Genentech's favor and that Gen-

1. For a discussion of recombinant DNA technology, see *In re O'Farrell*, 853 F.2d 894, 895–99, 7 USPQ2d 1673, 1674–77 (Fed.Cir.1988); *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 18 USPQ2d 1016 (Fed.Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

2. In this opinion, we refer to this 192–amino acid expression product as "met-hGH." We use the term "hGH" to refer to either natural human growth hormone or the identical 191–amino acid expression product.

3. The identity of the additional amino acids has been disclosed to the court and to Genentech as confidential information.

entech would suffer irreparable harm absent a preliminary injunction. The court therefore entered a preliminary injunction against Novo. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1292(c) (1994).

## DISCUSSION

■■ The grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 is within the discretion of the district court. *We Care, Inc. v. Ultra–Mark Int'l Corp.*, 930 F.2d 1567, 1570, 18 USPQ2d 1562, 1564 (Fed. Cir.1991). Accordingly, a court's decision granting a preliminary injunction will be overturned on appeal only upon a showing that the court abused its discretion. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 772, 28 USPQ2d 1378, 1380 (Fed.Cir.1993). An abuse of discretion may be established by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings. *Id.*

■ As the moving party, Genentech had to establish a right to a preliminary injunction in light of four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest. *We Care, Inc.*, 930 F.2d at 1570, 18 USPQ2d at 1564; *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed.Cir. 1988); *Nutrition 21 v. United States*, 930 F.2d 867, 869, 18 USPQ2d 1347, 1349 (Fed. Cir.1991) ("[A]t the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement."). If the patentee makes a "clear showing" that the asserted patent is not invalid and that it is infringed, then the patentee is entitled to a presumption of irreparable harm. *Atlas Powder Co.*

*v. Ireco Chems.*, 773 F.2d 1230, 1233, 227 USPQ 289, 292 (Fed.Cir.1985).

### A. *Likelihood of Success on the Merits*

#### 1. *Infringement—Process Patent Amendments Act*

Historically, it was not an act of patent infringement to import into the United States a product made abroad by a process patented in the United States. Therefore, Congress, concerned that foreign competitors were appropriating valuable American inventions, enacted the Process Patent Amendments Act of 1988 ("PPAA").[4] The PPAA made it an act of patent infringement to import, sell, or use in the United States, without authorization, a product made by a process patented in the United States. 35 U.S.C.A. § 271(g) (West Supp.1995).[5]

Genentech contends that Novo's importation of hGH into the United States infringes Genentech's patent rights because, Genentech asserts, Novo's process of making hGH literally infringes claim 2 of the '980 patent. Genentech's counterclaim is thus based upon 35 U.S.C.A. § 271(g), which provides:

> Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.... A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—
>
> (1) it is materially changed by subsequent processes; or
>
> (2) it becomes a trivial and nonessential component of another product.

35 U.S.C.A. § 271(g).

Section 271(g) requires that a patentee establish, *inter alia*, that an accused infringer imported, offered to sell, sold, or used a product made by a process falling within the scope of one or more claims of the patentee's

**4.** The PPAA was enacted as Title IX of the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107, 1563 (1988) (codified in scattered sections of 35 U.S.C.).

**5.** A provision concerning offers to sell was added to § 271(g) by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809, 4988 (1994) (effective Jan. 1, 1996).

United States patent.[6] Whether Genentech proved that Novo's process was within the scope of the asserted claim is the only question we need decide in this appeal.[7]

The district court held that Novo's method of making hGH fell within the literal scope of claim 2 of the '980 patent. On appeal, Novo contends that the court erred in its claim construction and that such error led the court to incorrectly conclude that Genentech established a likelihood of success on the merits. We agree.

■■■■ Determining whether a patent claim is infringed requires a two-step analysis: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys.,* 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). Claim construction is a question of law, which we review *de novo. Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.) (in banc), *cert. granted,* — U.S. —, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). In construing a claim, we will consider the language of the claim, the specification, and the prosecution history. *Id.*

Claim 2 of the '980 patent, the only claim asserted to be infringed, reads as follows:

> 2. A method for producing human growth hormone which method comprises culturing bacterial transformants containing recombinant plasmids which will, in a transformant bacterium, express a gene for human growth hormone unaccompanied by the leader sequence of human growth hormone or other extraneous protein bound thereto, and isolating and puri-

fying said expressed human growth hormone.

■■■■ The parties dispute the meaning of the claim term "human growth hormone," which appears four times in claim 2. Genentech argues that the term encompasses either met-hGH or hGH. Novo argues that the term encompasses only hGH (191 amino acids), as found in nature, and that the production of that material is not enabled. Novo points out that the '980 specification, in the background section, states that naturally occurring "[h]uman growth hormone ('HGH') is secreted in the human pituitary. It consists of 191 amino acids...." Col. 3, 11. 45–46. This is true. However, it has been long accepted that a patentee can be his own lexicographer, provided that he defines his terms. *E.g., Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc.,* 31 F.3d 1154, 1158, 31 USPQ2d 1653, 1656 (Fed.Cir. 1994). In light of the specification, we do not consider that claim 2 is limited to a method of producing natural hGH; it defines a method for recombinantly producing, in a bacterial host, an expression product, *i.e.,* "said expressed human growth hormone."

The specification defines the expression product produced by the process as follows:

> Of course, the expression product will in every case commence with the amino acid coded for by the translation start signal (in the case of ATG, f-methionine). One can expect this to be removed intracellularly, or in any event to leave the bioactivity of the ultimate product essentially unaffected.

Col. 7, 11. 52–57. Thus, the specification teaches that the expression product will be either met-hGH or hGH, depending on whether or not the extra methionine residue is cleaved intracellularly in the bacterial host. Whether the extra methionine is in fact

---

6. Pursuant to 35 U.S.C. § 295 (1994), the accused infringer's product is *presumed* to have been made by the patented process if the trial court finds that (1) a substantial likelihood exists that the product was made by the patented process, and (2) the patentee made a reasonable effort to determine the process actually used in the production of the product but was unable to so determine. 35 U.S.C. § 295. If the trial court makes these findings, the burden of establishing that the product was not made by the patented process is on the accused infringer. *Id.*

Section 295 is inapplicable in the present case, *inter alia,* because Genentech was able to determine the process Novo used to manufacture hGH.

7. Thus, we also have no opportunity in this appeal to address other issues that may arise in a § 271(g) case, such as the extent to which a product produced by a patented process may be materially changed by subsequent process steps before importation and still be found to infringe.

cleaved intracellularly is not important, according to the specification, because met-hGH and hGH were believed to be biologically equivalent.

 While the specification indicates that natural hGH has 191 amino acids, the specification has made clear that, in using the term "human growth hormone," the inventors meant either met-hGH or hGH. Therefore, because "[c]laims must be read in view of the specification, of which they are a part," *Markman,* 52 F.3d at 979, 34 USPQ2d at 1329, and the specification makes clear that what is initially expressed must have a methionine residue, but may be cleaved to hGH, we construe the claim term "human growth hormone" to encompass both met-hGH and hGH.

The parties also dispute whether claim 2 covers only the direct expression of human growth hormone or both the direct expression and cleavable fusion expression of the hormone. Novo argues that the claim only covers direct expression. Genentech contends, as it did before the district court, that claim 2 covers both the direct expression and cleavable fusion expression of human growth hormone. In support, Genentech points to the following language in the '980 specification:

Alternatively, the synthetic remainder may yield a proteolysis-resistant conjugate so engineered as to permit extra-cellular cleavage of extraneous protein, yielding the bioactive form.

. . . .

Applications will appear in which it is desirable to express not only the amino acid sequence of the intended product, but also a measure of extraneous but specifically engineered protein.... [E]xtraneous conjugate designed to permit specific cleavage extracellularly may be employed to compartmentalize intended products otherwise susceptible to degradation by proteases endogenous to the microbial host.

Col. 4, ll. 11–14; col. 7, ll. 3–6 and 20–24.

 It is true, as Genentech states, that the specification refers to both direct expression and cleavable fusion expression of human growth hormone. The specification teaches, for example, that the invention allows the "expression of either the intended product absent extraneous conjugated protein [*i.e.,* by direct expression], or intended product conjugated to but specifically cleavable from extraneous protein [*i.e.,* by cleavable fusion expression]." Col. 7, ll. 48–51. The claims, however, not the specification, measure the protected patent right to exclude others. *E.g., Environmental Designs Ltd. v. Union Oil Co.,* 713 F.2d 693, 699, 218 USPQ 865, 871 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). While claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection. What is not claimed, even though disclosed as part of the "invention," cannot be enjoined. *See infra* note 8. Significantly, claim 2 unquestionably specifies the expression of "human growth hormone *unaccompanied by . . . extraneous protein.*" The specification defines this as direct expression. In contrast, cleavable fusion expression, according to the specification, produces an expression product that *includes* "extraneous protein." Thus, it is apparent from the claim language, read in light of the specification, that claim 2 covers only a method of directly expressing human growth hormone and does not encompass a cleavable fusion expression process.

The prosecution history also supports this claim construction. In an October 28, 1982 Office Action, the U.S. Patent and Trademark Office ("PTO") rejected the pending claims as unpatentable over prior art showing the preparation of certain highly relevant fusion proteins. Genentech responded, in a January 14, 1983 Amendment, with the following statements:

The work of the inventors . . . represents the first occasion upon which a medically significant human polypeptide was *directly* expressed microbially rather than in conjunction with extraneous protein. The *direct* expression of product was made possible by the conjoint use of synthetic DNA and cDNA derived from messenger RNA. This . . . achievement—making possible the microbial production of a human poly-

peptide in *mature* form, that is, *unaccompanied* by any extraneous conjugated protein—was made possible, *inter alia*, by the marrying of DNA of artificial and natural source.

Thus, it contrasts sharply with work conducted by previous workers, including the work reported by the cited reference of Itakura *et al.* which focused on the preparation of fusion proteins wherein the desired portion was covalently linked with a portion of a microbial protein which protected the desired protein from proteolytic cleavage within the microbial cell. The fusion proteins, however, require further processing in order to arrive at [the] desired *protein in mature form.* This is not always possible to achieve because a lytic enzyme designed to cleave the produced polypeptide at the desired locus where desired protein is linked to the extraneous protein may, in addition, cleave the molecule at other locations so as to produce a protein which is incomplete and therefore probably largely useless. In any event, the extra cleavage step represents additional processing which, from an economic point of view, is to be avoided if possible.

The present invention provides the basis for dispensing with the necessity of an additional processing step. It, for the first time, provides a convenient method for producing in a host system a protein which is in mature form, having been expressed directly by means of this invention. [Emphasis in original].

Furthermore, Genentech distinguished the prior art by arguing that the patentable invention "produce[d] [the] desired protein unaccompanied by extraneous conjugated protein, thus for the first time achieving success in producing [the] desired protein in a direct manner." Similar assertions were made throughout the patent's lengthy prosecution. In an August 25, 1983 Response, Genentech argued that "the present application represents the first occasion upon which a medical-ly significant human polypeptide was prepared microbially directly expressed rather than as a fusion protein." Similarly, in its September 25, 1984 Amendment, Genentech represented to the PTO that "the work of the inventors underlying the present application demonstrated the first occasion upon which a medically significant human polypeptide was directly expressed microbially rather than in conjunction with extraneous (fusion) protein." Genentech then distinguished certain highly relevant prior art references (Itakura *et al.*) as disclosing

> the proper assembly of DNA sequences so as to effect expression of a heterologous DNA insert, both as a fusion protein and directly, under control of a homologous regulon.

> The disclosure in the Itakura *et al.* applications, therefore, teaches one skilled in the art not only how to produce a polypeptide as a fusion product, but also how to achieve direct expression of a desired polypeptide unaccompanied by an unwanted fusion protein. The work underlying the invention claimed by the present Applicants, however, represents the most facile means of achieving this result (by constructing the desired gene by combining cDNA and synthetic DNA) and represents the first instance in which the direct expression of a desired medically significant protein was clearly demonstrated.

Genentech consistently argued during prosecution that the patentable invention was a method of directly expressing human growth hormone; it never argued that the invention included cleavable fusion expression.[8] It is thus clear that claim 2 is limited to a method of directly expressing human growth hormone. The district court erred in adopting Genentech's broader reading of claim 2, which is not supported by the claim language, specification, or prosecution history of the patent.

---

8. As a practical matter, Genentech's retreat during prosecution from its reference to cleavable fusion expression is unsurprising, given the numerous PTO rejections of the claims as unpatentable over known fusion protein processes, and the fact that the '980 specification contains little, if any, specific disclosure of how to obtain the expression product by cleavable fusion expression. It appears that Genentech wrote a broader disclosure, but settled for patent protection for its preferred embodiment.

Thus, properly construed, claim 2 is a process for the direct expression of met-hGH or hGH. It is undisputed, however, that Novo does not directly express met-hGH or hGH; it uses a cleavable fusion process to produce hGH. Accordingly, Novo does not express "human growth hormone unaccompanied by ... extraneous protein," and does not literally infringe claim 2. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986) (literal infringement requires that every limitation of the patent claim be met); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 12 USPQ2d 1382 (Fed.Cir.1989) (same). We conclude, therefore, that the district court clearly erred in finding that Genentech established literal infringement of claim 2.

### 2. *Validity*

Novo argues that the district court erred in concluding that Genentech proved a likelihood of success on the question of the validity of claim 2. Novo contends, *inter alia,* that claim 2 is invalid under 35 U.S.C. § 112 in that it covers the direct expression of hGH, whereas the patent specification enables only the production of met-hGH.

In analyzing validity, "[t]he first step involves the proper interpretation of the claims." *Beachcombers, Int'l,* 31 F.3d at 1160, 31 USPQ2d at 1658. Here, Genentech's validity arguments and evidence in support of its preliminary injunction motion, and the district court's subsequent validity holding, were all premised on an erroneous construction of claim 2. However, we need not further consider the question of validity at this time because the clear absence of infringement alone mandates that we vacate the preliminary injunction. Moreover, deciding this issue requires resolution of factual questions by this court in the first instance which is not appropriate on appeal.

### B. *Irreparable Harm*

Novo argues that the district court's finding of irreparable harm was clearly erroneous. We agree. The court held that Genentech was entitled to a presumption of irreparable harm because Genentech made a strong showing of infringement and validity. The court's infringement finding, however, was clearly erroneous; thus, the court erred in presuming irreparable harm. *See Nutrition 21,* 930 F.2d at 871, 18 USPQ2d at 1351 (presumption of irreparable harm is improper absent a clear showing of infringement and validity). Given the court's error in presuming irreparable harm, the court's finding of irreparable harm must be vacated as clearly erroneous.

### C. *Other Factors*

The district court found that the equities and public interest were in Genentech's favor. Novo challenges these findings. Since the findings were also premised on an erroneous conclusion of infringement, they too must fall. Neither the public interest nor equity favors grant of an injunction against one who does not infringe.

We have considered the parties' remaining arguments, but find them either unpersuasive or unnecessary for resolution of the appeal.

### CONCLUSION

The district court erred as a matter of law in construing claim 2. Properly construed, claim 2 covers only the direct expression of met-hGH or hGH; it does not cover Novo's cleavable fusion process for producing hGH. Thus, the court clearly erred in finding that Genentech proved literal infringement of claim 2. The court's finding of irreparable harm was also clearly erroneous. The court abused its discretion in granting a preliminary injunction; thus, we vacate the injunction.

### COSTS

Costs are awarded to Novo.

***VACATED.***