ROCKWOOD PIGMENTS NA, INC. (formerly known as LaPorte Pigments, Inc.), and Chemische Werke Brockhues Ag, Plaintiffs–Appellees,

v.

AXEL J., LP, Axel J., LLC, Axel J. Corporation, and Axel E. Jungk, Defendants–Appellants.

No. 01–1227.

United States Court of Appeals, Federal Circuit.

Dec. 16, 2002.

## In re KAST, INC.

No. 02–1626.

United States Court of Appeals, Federal Circuit.

Dec. 13, 2002.

### ORDER

Before NEWMAN, LOURIE, and CLEVENGER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Axel J., LP; Axel J., LLC; Axel J. Corporation; and Axel E. Jungk (collectively "Axel") appeal the decision of the United States District Court for the Western District of Missouri[1] granting a preliminary injunction against sales of certain iron oxide pigment granules having the brand name "AXEL SMARTLINS" for use in coloring concrete. We *affirm.*

## BACKGROUND

Rockwood Pigments NA charged Axel with inducing infringement of United States Patent No. 4,946,505 (the '505 patent), for which Rockwood is the exclusive licensee.

The district court construed the claims, reported in *Laporte Pigments, Inc. v. Axel J., LP,* No. 00–0329–CV–W–5 (W.D.Mo. Aug. 18, 2000) (*Axel* I) and, after trial to a jury, entered final judgment of infringement and an injunction against further infringement. *Id.* (W.D.Mo. Nov. 30, 2000). The Federal Circuit affirmed. *Laporte Pigments, Inc. v. Axel J., LP,* No. 01–1226, 2002 U.S.App. LEXIS 16593 (Fed.Cir. Aug. 15, 2002) (non-precedential) (*Axel* II). Axel then changed the formulation of its pigmented granules, and on December 15, 2000 Rockwood moved for an injunction against sales of the changed formulation, and alternatively for an order of contempt of the existing injunction. The district court denied these motions, but invited Rockwood to file a new infringement action against Axel. Rockwood

did so and moved for a preliminary injunction, which the district court granted. *Rockwood Pigments NA, Inc. v. Axel J., LP,* No. 01–0038 (W.D.Mo. Jan. 24, 01) (*Axel* III). This appeal followed.

I

The grant of an injunction *pendente lite* is reviewed on the standard of abuse of discretion. *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387, 2 USPQ2d 1926, 1927 (Fed.Cir.1987). Abuse of discretion arises if the court made an error of law, exhibited a clear error of judgment, or made clearly erroneous factual findings upon which it based its decision. *Novo Nordisk of North America, Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1367, 37 USPQ2d 1773, 1775 (Fed.Cir.1996).

Rockwood, as the party requesting the injunction, was required to establish entitlement thereto in light of four factors: (1) whether there is a reasonable likelihood that it would succeed on the merits at trial; (2) whether it would suffer irreparable harm if the injunction were not granted; (3) whether the balance of hardships tipped in its favor; and (4) the impact of the requested injunction on the public interest. *Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed.Cir.1988). Likelihood of success and irreparable harm are threshold requirements, and failure to establish both requirements will normally defeat the grant of an injunction *pendente lite. See Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1088, 46 USPQ2d 1257, 1259–60 (Fed.Cir.1998).

Axel concentrates on the question of whether Rockwood established its likelihood of successfully proving infringement, raising four arguments: (1) that the dis-

---

**1.** *Rockwood Pigments NA, Inc. v. Axel J., LP,*    No. 01–0038 (W.D.Mo. Jan. 24, 2001).

trict court erred in its claim construction, specifically as to the claim term "at least one binder for promoting the dispersal of the pigment in the concrete"; (2) that the district court erroneously decided that the binder was not claimed in means-plus-function form; (3) that the district court seriously misjudged the evidence of inducement to infringe; and (4) that Axel is not likely to be found liable for infringement because it is practicing the prior art. Claim 1 follows:

> 1. A process of dyeing concrete comprising mixing pigment-containing granules with cement and aggregate at conditions sufficient to result in a generally homogeneous dispersal of pigment in the concrete, wherein:
>
>> pigment-containing granules other than compacted or briquette granules are used,
>>
>> each granule consisting essentially of at least one pigment selected from the group consisting of manganese oxide and iron oxide and of at least one binder for promoting the dispersal of the pigment in the concrete,
>>
>> at least 90% of the granules have a particle size of about 20 microns or more, and
>>
>> the finite water content of the granules is not in excess of about 4.2%.

### 1.

The claim construction arguments were previously considered in *Axel* II, wherein this court held that the district court had construed claim 1 too narrowly, but that since the narrow construction favored Axel, any error was harmless. In *Axel* III the district court again construed claim 1, and again rejected Axel's argument that claim 1 should be limited to water-soluble binders. The district court observed that the '505 patent shows two methods of binder activity: (1) a water-soluble binder that

dissolves in the water mixed with the concrete, and (2) a binder that is broken up by the shear forces encountered in the mixing process. It was determined in *Axel* II that the court's construction therein was too narrow in that the specification does *not require that the binder have characteristics superior to binders of the prior art. See Axel* II at *9–10. The court held that the prosecution history imposes only the limitation that the binder not contain hydraulic material, as reflected in this court's modification of the claim construction:

> We therefore construe a "binder" as a material that promotes dispersal of the pigment in the concrete, subject to the express disavowal during prosecution that it not contain hydraulic material.

*Axel* II at *10.

Since the district court in *Axel* I had construed the claim more narrowly than necessary, any error was to Axel's advantage, and hence was harmless in the context of that case. In *Axel* III, which was decided by the district court before our decision in *Axel* II, the district court continued to rely on its prior narrow claim construction. Again, since the narrow construction favored Axel, the error was harmless.

### 2.

The means-plus-function argument is the same as that raised and resolved in *Axel* II, wherein this court observed that including the function of the binder in the claim does not convert the claim term to means-plus-function form. We explained that the patentee may choose to write the claim as, for example, "means for binding," and thereby obtain the benefits of § 112 ¶ 6, or may claim the "binder" and include the function of the binder in the claim. *Axel* II at *11. The holding of *Axel* II is controlling.

## 3.

Axel's changed formulation replaced the binders of its prior formulation (brand name products NeoCryl or K–702 or CSH), the binders used in *Axel* I and *Axel* II, with a binder having the brand name Carbopol. Carbopol is described by Axel as a sodium polyacrylate polymer thickener made by B.F. Goodrich Co. Axel states that it is now simply practicing the prior art, in that its Carbopol formulation is an obvious variation of that described in expired United States Patent No. 3,843,380 to Beyn.

The Beyn patent shows a process for treating a mineral pigment to become readily dispersible in paint or plastic, the patent stating that "plastic means any conventional moldable material within the common usage of the word [including] Portland cement concrete." Both Beyn and the '505 patent are directed to pigment granules that are of sufficient size and strength to permit normal handling without caking or disintegrating into dust, yet are capable of dispersion with sufficiently rapid disintegration to be effective colorants in the media for which they are designed. Beyn teaches the production of pigmented granules by spray drying a slurry consisting of primary pigment particles, water, and from 0.1 to about 5% of a water soluble thickener. The thickener is described as "any organic, colloidal, high molecular weight compound which is capable, in small concentrations of visibly causing thickening when added to water." The thickener is selected to be normally solid at room temperature, non-degradable at drying temperature (Beyn states about 400°F or less), and "capable of redissolving or redispersing in the admixture to which the pigment is added." After spray drying, the Beyn pigment aggregates are recovered by conventional cyclone separation and bagged. Axel states that the differences between its process and that of Beyn "are obvious under 35 U.S.C. § 103(a)."

The district court did not agree that Axel was practicing the Beyn process or an obvious variant thereof. Rockwood presented to the district court the differences between the Beyn process and that practiced by Axel, including differences in raw materials, different operating temperatures, a different sequence of steps, and a different product. For example, Dr. Beall, a colloid chemist and one of Rockwood's technical witnesses, testified that Carbopol is not a colloidal thickener, as required by all of the claims of the Beyn patent, but instead a three-dimensional microgel. Dr. Beall relied both on the manufacturer's technical literature and his own experiments in arriving at this conclusion.

Rockwood's other technical witness, Dr. Stoffer, pointed to eleven differences between the operation of Axel's manufacturing plant, which he personally observed, and the process described in the Beyn patent. For example, he testified that Beyn specifies a drying temperature of between about 200–400°F, while Axel dries at a temperature of about 800°F. Similarly, the feed pressure taught in Beyn is 5 psig (pounds per square inch gauge) while Axel's process operates at between 150 to 275 psig. Also, the slurry fed to the drier is prepared differently in the two processes: while Beyn begins with a filter cake, a filter cake is not used in the Axel process; and the other ingredients are added to the slurry in different sequences. This evidence well supports the district court's conclusion that Axel did not have a reasonable probability of showing that it was practicing the Beyn process or an obvious variation thereof.

Axel, as inventor and assignor of the '505 patent, is estopped from challenging its validity, as discussed in *Axel* II at *12 ("In any event, we cannot consider the

validity of the claim, as Axel is estopped from asserting the invalidity of the patent that Dr. Jungk previously assigned to Brockhues."). *See Diamond Scientific v. Ambico, Inc.,* 848 F.2d 1220, 1224, 6 USPQ2d 2028, 2030 (Fed.Cir.1988) ("assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or a patent application) from later contending that what was assigned is a nullity"). Axel is not, however, estopped from asserting that it is practicing the prior art and is outside of the scope of the invented/assigned '505 patent. *See Scott Paper Co. v. Marcalus Manufacturing Co.,* 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, 67 USPQ 193 (1945) (the assignor of the patent could defend a suit for infringement of that patent on the ground that he was practicing the subject of an expired prior art patent). The district court's findings and conclusions that Axel is not practicing the prior art have not been shown to be incorrect. Thus this aspect does not weigh against the likelihood that Rockwood will succeed in its charge of infringement.

### 4.

Considering all of the arguments presented, we affirm the district court's finding that there was a likelihood that Rockwood would succeed on the merits of its charge of infringement.

## II

Axel argues that the district court seriously misjudged the evidence of inducement to infringe, stating that "inducement" requires intent to cause infringement, whereas Axel's intent was to avoid infringement. Rockwood responds by referring to the evidence that Axel intended the sale and use of its modified granules, and thus that Axel intended to induce infringement by marketing the granules for their intended use. Rockwood points out that use in the claimed process is the only known use of the Axel granules, and that they are sold for this purpose. Inducement under 35 U.S.C. § 271(b) refers to inducement to perform certain acts. The patentee must establish that the alleged infringer acted to induce infringing acts by another, and that he knew or should have known that his actions would lead to acts of direct infringement. *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553, 16 USPQ2d 1587, 1594 (Fed.Cir. 1990). The cause of action for inducement of infringement is not avoided by the marketer's preference or hope that the induced actions may avoid infringement.

In *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1529 (Fed.Cir.1990) the court explained that "actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." Axel does not dispute that its entire marketing and sales program is directed to the coloring of concrete using the accused pigmented granules. There was ample evidence before the district court to support its conclusion that Rockwood was likely to succeed in proving that Mr. Jungk, Axel's president, knew or should have known that sale or use of the reformulated Smartlins pigment granules in the United States would cause infringement of the '505 patent. Axel had already been adjudicated liable for infringement by its previous formulation of pigment granules and, as the inventor of the '505 patent, Mr. Jungk was familiar with the patent and the technology.

Conclusion

On the claim construction established in *Axel* II, the district court did not abuse its discretion in granting a preliminary injunction against Axel's infringing activity

based on the modified Carbipol-containing granules.